UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CVC, INC., | ) |
| | ) |
| Plaintiff, | ) CIV. ACTION NO.: |
| v. | ) *ECF CASE* |
| | ) |
| ORIDION CAPNOGRAPHY, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**07 CV 4561**

MAY 3 0 2007

## COMPLAINT

Plaintiff, CVC, INC. ("CVC"), by and through its undersigned attorneys sues Defendant, Oridion Capnography, Inc. ("Oridion") and alleges:

1.    CVC is a Texas corporation with its principal place of business at 2320 Michigan Court, Arlington, Texas 76016.

2.    Oridion is a Delaware corporation with its principal place of business at 21 Highland Circle, Needham, Massachusetts 02494.

3.    The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 on the basis of diversity of citizenship.

5.    The February 21, 2005 Distributor Agreement ("Agreement") between the parties provides, "any action brought to enforce this Agreement shall be brought exclusively in the State of New York."

## FACTS

6.    Effective February 21, 2005, CVC began serving as an exclusive distributor of sophisticated medical products manufactured and/or marketed and sold by

Oridion, pursuant to the Agreement of the same date. A copy of the February 21, 2005 Distributor Agreement is attached hereto and made part hereof as Exhibit 1.

7.      The Agreement had an initial term of three years, until February 21, 2008, when it was to automatically renew for successive one-year terms, unless Oridion gave proper notice of its intent not to renew at least 90 days prior to termination. *See* Exhibit 1, Agreement at ¶3.

8.      The Agreement could be terminated only for the reasons specified therein. Exhibit 1, Agreement at ¶15.

9.      On October 3, 2006, Defendant wrote to CVC and improperly terminated the Agreement effective October 13, 2006, a copy of the October 3, 2006 letter is attached hereto and made part hereof as Exhibit 2.

10.     The purported basis for the termination was that CVC violated the Agreement by contracting with Sentec Corporation, which Defendant contended was a violation of paragraph 14 of the Agreement, which states as follows:

> It is Distributor's unilateral policy to sell, contract to sell, distribute, act as sales agent with regard to and consult regarding only one brand of non-invasive respiratory monitoring and breath testing medical equipment and products, and Distributor hereby commits to selling, contracting to sell, distributing, acting as sales agent with regard to and consulting regarding only the Company brand of said equipment and products for the duration of this contract. Should Distributor deviate from this unilateral policy: (i) Distributor shall inform the Company in writing of such fact within five (5) business days of deviating from this unilateral policy (the "Deviation Notice"); and (ii) Company may terminate this contract pursuant to Section 15.a hereof upon giving Distributor 10 business days notice, whether or not Company has received the Deviation Notice.

2

11.    CVC did not violate the Competitive Products Policy since it represented no company that manufactured a product that distributor would have been precluded from selling under the language of paragraph 14 of the Agreement.

## COUNT I
## BREACH OF CONTRACT

12.    CVC incorporates by reference the allegations of paragraphs one through 11 as though fully set forth herein.

13.    Oridion breached the Agreement by improperly terminating the Agreement effective October 13, 2006.

14.    Oridion's conduct was intended to deprive CVC of the benefits of the parties' agreements and violated the implied covenant of good faith and fair dealing.

15.    As a result of Oridion's breaches, CVC has suffered and continues to suffer damages including but not limited to lost profits.

WHEREFORE CVC requests this Court to enter a judgment against Oridion for compensatory damages, prejudgment interest, court costs and attorney fees.

## COUNT II
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT

16.    CVC incorporates by reference the allegations of paragraphs one through 15 as though fully set forth herein.

17.    The business dealings and transactions between CVC and Oridion are acts constituting trade and commerce under Mass. Gen. Laws ch. 93A, and occurring primarily in the Commonwealth of Massachusetts.

18.    Oridion employed unfair methods of competition and unfair or deceptive acts or practices in the conduct of its businesses, thereby damaging CVC. These acts and

practices and the injuries sustained by CVC as a result of Oridion's conduct occurred primarily and substantially within Massachusetts where Oridion and its agents conducted business.

19.     The unfair methods of competition and the unfair or deceptive acts or practices committed during the course of the relationship between the parties were unlawful under 15 U.S.C. §45(a)(1) and Mass. Gen. Laws Ch. 93A §§2(a) and 11 and the regulations promulgated thereunder by the Attorney General at 940 Code Mass. Regs. §3.16(4).

20.     The unfair methods of competition and unfair or deceptive acts or practices committed by Oridion include but are not limited to defendant intentionally, willfully, knowingly, and in bad faith acting in disregard of known contractual arrangements and in a manner intended to secure benefits for Oridion, causing substantial injury to CVC.

21.     Oridion's conduct offended public policy as it has been established by common law and other established concepts of unfairness; defendant acted in a manner that was immoral, unethical, oppressive, and unscrupulous and in a manner that a reasonable business person would find reprehensible.

22.     Oridion's conduct has caused CVC to suffer damages.

23.     Pursuant to Mass. Gen. Laws ch. 93A, §11, CVC, as a result of Oridion's willing or knowing unfair business practices, is entitled to up to three times the amount of damages suffered.

WHEREFORE, CVC requests this Court enter a judgment against Oridion for multiple damages as required or authorized by statute, for attorney fees, and for such further relief as the Court may deem just and proper.

## COUNT III
## TORTIOUS INTERFERNCE WITH PROSPECTIVE BUSINESS ADVANTATAGE

24.     CVC incorporates by reference the allegations of paragraphs one through 23 as though fully set forth herein.

25.     CVC has ongoing business relationships with third parties in the exclusive territory in which it sold Oridion's products, including Midwest Regional Hospital in Oklahoma.

26.     Defendant knew of CVC's relationship with Midwest Regional Hospital and intentionally interfered with it.

27.     In interfering with the relationship between CVC and Midwest Regional Hospital, defendant used wrongful means or acted solely out of malice.

WHEREFORE CVC requests this Court to enter a judgment against Oridion for compensatory damages, punitive damages, prejudgment interest, court costs and attorney fees.

5

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

_____

Henry A. Lowet, Esquire
Attorney # HL1957
666 Fifth Avenue
New York, New York 10103-0084
(212) 977-9700
facsimile (212) 262-5152


Of counsel:
KRAMER & KRAMER, LLP
Mitchell A. Kramer
Pennsylvania Bar No. 04036
1077 Rydal Road, Suite 100
Rydal, PA 19046
(215) 887-9030
mkramer@kramerandkramer.com

Barbara H. Kramer
Michigan Bar No. P49318
24 Frank Lloyd Wright Drive, Lobby D
Ann Arbor, MI 48105
(734) 930-5452
bkramer@kramerandkramer.com

# EXHIBIT 1

**Microcap End-tidal CO2 monitor and FilterLine**
**DISTRIBUTION AGREEMENT**

**BETWEEN**

**Oridion Capnography, Inc.**

**AND**

**CVC, Inc.**

DISTRIBUTION AGREEMENT
CONTENTS

1.  Terms...................................................................................................... 2
2.  Appointment .......................................................................................... 2
3.  Term ........................................................................................................ 2
4.  Quota Requirements............................................................................... 3
5.  Price and Payment .................................................................................. 3
6.  Order and Supply of Products................................................................ 3
7.  Distributor Discounts ............................................................................. 3
8.  Obligations of Distributor ...................................................................... 4
9.  Obligations of the Company................................................................... 5
10. Warranty and Limitation of Liability .................................................... 5
11. Recall...................................................................................................... 6
12. Indemnification....................................................................................... 6
13. Confidential and Other Information........................................................ 7
14. Termination ............................................................................................ 8
15. Force Majeure ........................................................................................ 9
16. Miscellaneous......................................................................................... 9
EXHIBIT A - Products and Suggested List Pricing and Distributor Discount......................... 11
EXHIBIT A1 – Exclusive Products ......................................................... 14
EXHIBIT A1 – Exclusive Products ......................................................... 14
EXHIBIT B – Area of Primary Responsibility......................................... 15
EXHIBIT C – Quota Requirements .......................................................... 16
EXHIBIT D – Terms of Sale .................................................................... 17
EXHIBIT E – Returned Goods Policy ...................................................... 18
EXHIBIT F – Product Warranty................................................................ 19
EXHIBIT G – Ownership and Management of Distributor........................ 21
EXHIBIT H – Distributor's business relationships ................................... 22

## DISTRIBUTOR AGREEMENT

This Agreement, effective as of the 21 day of February, 2005, quota effective April 1,2005, is by and between Oridion Capnography INC., a Corporation located at 21 Highland Circle Needham, MA  02494, (the "Company") and CVC Inc., a Corporation located at 2320 Michigan Court, Arlington, TX 76016 (the "Distributor").

## RECITALS

A.     The Company is primarily engaged in the business of manufacturing and selling non- invasive respiratory monitoring and breath testing medical equipment and products.  The Company desires to appoint Distributor to distribute its products within a defined geographic territory to assist the Company in marketing its products listed in Exhibit A. Distributor will have exclusive distribution of Products in Exhibit A1

B.     Distributor has the necessary resources, experience and expertise to provide assistance to the Company in marketing the Company's products, and desires to provide such assistance to the Company pursuant to the terms and conditions set forth herein.

The parties agree as follows:

1. **Terms**

   a.  "Hospitals" shall mean those hospital customers purchasing the Products, from the Company or the Distributor, for direct use in Hospital and Ambulatory Surgery Center environments where $CO_2$ monitoring is performed, and not for purposes of re-distribution and/or resale.

   b.  "Suggested List Price" shall mean the Company's then-current price for any Product as determined and published by it from time to time, excluding any and all charges for installation, labor and materials, freight, insurance, duties or taxes.

   c.  "Invoice Price" shall mean the amount actually charged by the Company to the Distributor, excluding any and all charges for installation, labor and materials, freight, insurance, duties or taxes, or similar charges.

   d.  "Products" shall mean the equipment listed and described in Company's Price List set out in Exhibit A.

   e.  Distributor Area of Primary Responsibility (APR) and markets shall mean the geographic area described in Exhibit B.

2. **Appointment**

   a.  The Company appoints Distributor as its non-exclusive sales distributor in the APR to purchase, promote, market, and sell the Products to Hospitals and Ambulatory Surgery Centers during the term of this Agreement on the terms and conditions set forth herein, and Distributor accepts such appointment. Distributor may only distribute Products itself and aggress not to appoint sub distributors without prior written consent from Company. Notwithstanding the above, the Distributor shall have exclusivity in the APR for the products listed in Exhibit A1; however, all Kaiser accounts will remain direct Company accounts until a program is agreed to by Company and Distributor.

   b.  The Company reserves the right to accept orders directly from Hospitals if Distributor's account remains unpaid for a period of sixty (60) or more days, excluding invoices which are in dispute, and Distributor shall have no right to commissions on such sales by the Company. Further, the Company reserves the right to accept orders from hospitals who insist on purchasing products directly from the manufacturer. In such cases, the Company will commission the Distributor on these sales in an amount equivalent to the discount that is currently in effect for Distributor at List Price, If pricing is deviates from List Price, the distributor will have the choice of absorbing the margin impact or passing this particular account back to company to manage directly on a non-commissionable basis. In the case that said account meets "Large Account Volume Commitments", Exhibit A, Company will provide an additional 5% Discount off contracted Dealer Pricing. The provisions of this section shall not be construed as limiting in any way the right of the Distributor to sell products to any person, organization or governmental body.

3. **Term**

   This Agreement shall become effective as of the signing of this agreement ("Effective Date") and shall continue in force for a period of three (3) years ("Initial Term"). This agreement shall be

automatically renewed thereafter for successive one-year terms ("Renewal Terms") unless the Company gives notice of its intent not to renew at least 90 days prior to termination.

4. **Quota Requirements**

    a.    Prior to the beginning of each contract year, the Company shall establish an annual Distributor mutually agreed upon Quota Requirement ("Quota") for sale in the Distributor's APR for each quarter of each contract year (see Exhibit C). The Quota will take into consideration market penetration and past year sales results. The unit of measurement that the quota will be based on is "boxes" of FilterLine® products of 25 each and MicroCap® CO2 monitors sold as 1 per box. Distributor agrees to promote the sale of Products within its APR.

    b.    Distributor must maintain Quota compliance over a Quarterly (3-month) basis. If Distributor falls below 70% of quota, and ranks below the average sales performance per/rep as compared to other distributors, it will be brought to the attention of Distributor management. In the event that fewer than three other dealers have more than one year's experience selling products covered by this agreement, compliance shall be judged against the quota alone. Distributor management will have thirty (30) days to implement corrective plan. If the plan fails to bring performance back to Quota compliance within forty-five (45) days, Company reserves the right to take the business on a non-commissionable direct basis or initiate termination process.

5. **Price and Payment**

The Company agrees to sell Products to Distributor at discounts from the Company's suggested list prices on terms and conditions as established by the Company. The Company's current payment terms and terms of sale are set forth in Exhibit D, and the Company's suggested list price and distributor discount are set for in Exhibit A. The Company may change prices or terms at its discretion; however, the Company will provide Distributor a ninety (90) day notice prior to implementing any such change. Distributor contracts on specific products will have price protection for up to 6-months from the initial notification date. To qualify for price protection for the duration of a contract, individual contracts must have prior written approval by Company's VP of Sales.

6. **Order and Supply of Products**

    a.    The Company shall use reasonable commercial efforts to supply Products according to Distributor's purchase orders. When conditions beyond the Company's reasonable control cause a protracted delay, the Company will make every effort to notify Distributor in a timely manner of such circumstances. Accepted purchase orders will be filled as soon as possible. The Company shall have the right to make shipments of Products in separate lots as reasonably necessary. The Distributor shall adhere to the Company Returned Goods Policy as set out in Exhibit E.

    b.    All shipments of Products to Distributor will be F.O.B. Company's manufacturing/Shipping facilities. Distributor will be charged for all shipping and handling expenses.

7. **Distributor Discounts**

The sole consideration available to Distributor hereunder shall be the Distributor discount percentage off the Company's suggested List Price, as shown on Company's U.S.A. Price List, January 1, 2004, set out in Exhibit A.

8.    **Obligations of Distributor**

During the term of this Agreement, Distributor shall:

a.    Comply with its mutually established Quota Requirements.

b.    Use its best efforts to actively promote sales of Company Products within the APR.

c.    Maintain stock of at least forty five (45) days inventory of Products. This Inventory is to be based on historic unit movement.

d.    Distributor will provide monthly forecast so Company can meet expected lead times required.

e.    Train hospital clinicians on the use and application of Company Products. The quality of this training shall be measured by using a customer satisfaction questionnaire mutually agreed upon, by Company and Distributor, the results of which shall be available for review of Company upon its request. Failure to provide training at a satisfactory level to Company is a material breach of this contract.

f.    Review with representatives of the Company at least quarterly sales performance, plan sales strategy and discuss/resolve sales issues.

g.    Maintain the resources, experience and expertise to fully perform its obligations under this agreement.

h.    Distributor shall provide the Company monthly and quarterly sales forecasts, for the immediately succeeding thirty (30) and ninety (90) day periods.

i.    Distributor agrees to execute Company's marketing strategy surrounding the "Team Capnography" concept with full cooperation. The Distributor and Company will profile key facilities that meet mutually developed criteria, and Company will provide a Speaker to delivery a strong message to a very defined group of clinicians on the benefits of Capnography. Distributor and Company will follow-up within account to maximize the impact of the messaging presented. This program will continually be refined based on mutual feedback from Distributor and Company with the intent of maximizing impact of this marketing program.

j.    Distributor will be responsible for all aspects of the sale from demo, clinical trails and post-sale inservice. Company sales personnel may assist in sales efforts to help maximize sales impact.

k.    Distributor will report on a monthly basis the name, location and monthly volume of all new accounts. The report will be used to credit the appropriate Company personnel.

l.    The Distributor will provide any information and assistance necessary to enable the Company to comply with its undertakings in section 9 herein below.

9.    **Obligations of the Company**

The Company shall:

a.    Provide Distributor with general promotional literature, data, product bulletins, etc.

b.    Maintain an ongoing program of advertising and sales promotion regarding Products, including attendance at national trade shows.

c.    Meet with Distributor at least quarterly to review sales performance, plan sales strategy and discuss/ resolve sales issues.

d.    Provide and schedule from time to time, product-training sessions for Distributor sales personnel.

e.    Track and monitor sales performance to quota on a quarterly and annual basis by organization and representative.

f.    Share with Distributor, on a quarterly basis, quota performance of all similar distributors.

g.    Company shall grant Distributor, the privilege of balancing its inventory without incurring a restocking charge, once annually. Such rebalancing of inventory shall not create a negative impact to Company (i.e., returning of 6 boxes of non-moving inventory, shall be offset by Distributor purchases of moving inventory in like dollars).

h.    Periodically call new customer locations to request feedback on training. Reported issues will result in a cure plan developed by Company and Distributor. This commercially reasonable plan will be implemented within 30 days by Distributor.

i.    Give 90-day written notice prior to obsolescing any products

10.    **Warranty and Limitation of Liability**

a.    The Company warrants to Distributor that the Products are as warranted in Exhibit F (the "Warranty"). The Company's sole obligation and the sole remedy of Distributor under the Warranty shall be the replacement of defective Products by The Company. No other adjustment or payments shall be made to Distributor with respect to breaches of the Warranty by the Company.

b.    Except as set forth above, THE COMPANY MAKES NO WARRANTIES OF ANY KIND HEREUNDER, WHETHER EXPRESS, IMPLIED OR ARISING FROM TRADE USAGE, CONTRACT, TORT OR OTHERWISE, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

c.    IN NO EVENT SHALL THE COMPANY BE LIABLE FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT OR IN CONNECTION WITH THE USE OR PERFORMANCE OF, OR RESULTS OBTAINED OR NOT OBTAINED

FROM THE USE OF THE PRODUCTS, BY DISTRIBUTOR, HOSPITALS, OR OTHERWISE.

d.      Distributor shall have no authority to make any representation or warranty with respect to any Product except as set forth in the Company's current written warranty given to Hospitals for the Products, copies of which shall be forwarded to Distributor from time to time.

## 11.    Recall

In the event of a voluntary or mandatory recall of Products by the Company for any reason, the Distributor shall, at the discretion of the Company, cooperate in promptly contacting customers and retrieving recalled Products. In that circumstance, the Company shall reimburse Distributor for direct telephone, freight and mail costs incurred in complying with the Company's request, or provide complete tracing of all recalled product at no expense, so Company can execute the recall itself.

## 12.    Indemnification

a.      Except as limited in Section 12(b) hereof, the Company shall defend and indemnify Distributor from and against any liability arising out of any claim that any Products purchased hereunder infringe a valid United States patent; provided that (i) Distributor shall have given the Company timely notice of any infringement claim and reasonable cooperation, information and assistance in connection therewith, and (ii) the Company shall have sole control and authority with respect to defense or settlement thereof. Should any Products delivered hereunder become, or in the Company's opinion be likely to become, the subject of such a claim, the Company may, at its option, eliminate such infringement by procuring for Distributor the right to continue using any such Products, replacing or modifying any such Products so that they become non-infringing or refunding to Distributor the purchase price paid for such Products.

b.      The Company shall have no liability or obligations to Distributor hereunder with respect to any patent infringement or claim thereof based upon (i) use of the Products in combination with devices or products not purchased hereunder where the use of the Products alone would not be infringing; (ii) use of the Products in an application or environment for which such Products were not designed or contemplated; (iii) modification of the Products; (iv) any claim of infringement of a patent in which Distributor or any affiliate of Distributor has an interest or license; or (v) any claim of infringement made in respect of use after the Company notifies Distributor of the possibility of infringement. The foregoing states the entire liability of the Company with respect to infringement of patents by the Products or any part thereof.

c.      Distributor shall indemnify and hold Company harmless from and against all claims, demands, liabilities and expenses incurred or suffered by Company arising out of (a) any representation made by Distributor to third parties creating any obligation or liability regarding the Company or the Products which the Company has not specifically assumed or approved either under this Agreement or by prior written consent, (b) Distributor's breach of the confidentiality provisions of this Agreement, (c) Distributor's failure to comply with all applicable federal, state and local laws, regulations and ordinances in the marketing of the Products, (d) any injury to persons or property caused by or resulting from any act of negligence by

Distributor or its authorized agents in the transportation, possession, or use of the Products.

d.  Company undertakes to maintain in effect product liability insurance and will add Distributor as an insured party under such policy. A certificate of insurance listing the Distributor is set out in Exhibit I.

## 13.  Confidential and Other Information

a.  Confidential Information.  Each Party agrees that it shall use the same degree of care and means that it utilizes to protect its own Confidential Information of a similar nature, but in any event not less than reasonable care and means, to prevent the unauthorized use or the disclosure of Confidential Information to third parties. The Confidential Information may be disclosed only to employees or contractors of a recipient on a "need to know" basis who are instructed and agree not to disclose the Information and not to use the Confidential Information for any purpose, except as set forth herein. The recipient shall have appropriate written agreements with any such employees or contractors sufficient to allow the recipient to comply with the provisions of this Agreement. Each of the Parties further agrees to make no use of such Confidential Information except as expressly permitted by this Agreement. The obligations of confidentiality and restricted use set forth in this Section 13 (Confidential Information) shall survive the expiration or any earlier termination of this Agreement for a period of three (3) years.

The term "Confidential Information" shall include any and all information regarding either party to this Agreement with is not entirely in the public domain, subject to the limitations set out in section 13.b below.

b.  Exceptions. Confidential Information of a Party shall not include and the foregoing obligation shall not apply to data or information which: (i) was in the public domain at the time it was disclosed or falls within the public domain, except through the fault of the receiving party; (ii) was disclosed after written approval of the disclosing party; (iii) becomes known to the receiving party from a third party not in violation of any contractual, legal or fiduciary obligation by such third party as substantiated by clear and unequivocal written evidence to this effect; or (iv) is furnished to a third party by the disclosing party without an obligation of confidentiality. Nothing in this Agreement shall prevent the receiving party from disclosing Confidential Information to the extent the receiving party is legally compelled to do so by any governmental investigative or judicial agency pursuant to proceedings over which such agency has jurisdiction; provided, however, that prior to any such disclosure, the receiving party shall (a) assert the confidential nature of the Confidential Information to the agency; (b) immediately notify the disclosing party in writing of the agency's order or request to disclose; and (c) cooperate fully with the disclosing party in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of the compelled disclosure and protecting its confidentiality.

c.  Exceptions (i) through (iv) shall not permit receiving party to disregard the obligations of confidentiality herein merely because individual portion(s) of the Confidential Information may be found within such exceptions, or

because the Confidential Information is implicitly but not explicitly disclosed in information falling within such exceptions.

d.  Return of the Confidential Information. The receiving party shall promptly return the Confidential Information and all copies, notes and extracts thereof, of the disclosing party upon termination of this Agreement or earlier upon the request of the disclosing party, at no cost whatsoever to the disclosing party.

e.  Distributor shall use promotional and advertising literature and information furnished by the Company in furtherance of the promotion and marketing of the Products. Any information outside Company issued materials, must be approved by Company before release.

## 14.  Distribution of Competitive Products Policy

It is Distributor's unilateral policy to sell, contract to sell, distribute, act as sales agent with regard to and consult regarding only one brand of non-invasive respiratory monitoring and breath testing medical equipment and products, and Distributor hereby commits to selling, contracting to sell, distributing, acting as sales agent with regard to and consulting regarding only the Company brand of said equipment and products for the duration of this contract. Should Distributor deviate from this unilateral policy: (i) Distributor shall inform the Company in writing of such fact within five (5) business days of deviating from this unilateral policy (the "Deviation Notice"); and (ii) Company may terminate this contract pursuant to Section 15.a hereof upon giving Distributor 10 business days notice, whether or not Company has received the Deviation Notice.

## 15.  Termination

1.  Company or Distributor may terminate this Agreement at any time by providing written notice for causes specified below:

   a.  Distributor's breach of Section 8 (Obligations of Distributor), 14 (Distribution of Competitive Products Policy) or Exhibit H. hereof, or Distributor's or Company's breach of any other material provisions of this Agreement upon 10 days prior written notice from the Company.

   b.  Failure of Distributor to pay the balance of any invoice for a period of sixty (60) days after receipt of invoice, excluding invoices which are in dispute.

   c.  Distributor or Company becomes bankrupt or insolvent.

   d.  Distributor falls below 70% of quota during the contract, as per Section 4b. above.

2.  Should the Company choose to sever the agreement, Company is obligated to honor those agreements between Distributor and end-user of Company product, to the anniversary of contract, at established dealer pricing.

3.  Should the Company choose to sever the agreement, other than non-performance by Distributor, Company is obligated to accept return of all Distributor inventories, which is new and unused, at the price at which the product was purchased without restocking fees. . Credit for such return shall not be withheld.

## 16.  Force Majeure

Neither party shall be considered in default in performance of its respective obligations under this Agreement if such performance is prevented or delayed because of conditions constituting force majeure, which shall include without limitation strikes, material shortages, governmental restraints, acts of God or other events not within the control of the party affected. Upon the occurrence of an event of force majeure, the affected party shall give notice of such event to the other party to this Agreement and shall use reasonable commercial efforts to mitigate or avoid the effects of such force majeure event. If an event of force majeure shall prevent the Company from delivering Products to the Distributor or the Distributor from accepting delivery of Products from the Company for a period of 180 days, then either party shall have the right to terminate this Agreement by written notice to the other party.

## 17.  Miscellaneous

a.  Distributor acknowledges and agrees that all proprietary rights in the Product delivered to Distributor by Company, including but not limited to patents, copyrights and trademarks, are and shall remain at all times the exclusive property of Company or its vendors and licensors and may not be duplicated by Distributor or used except pursuant to this Agreement and that Distributor, by taking delivery of, making payment for, distributing, and selling or otherwise using or transferring any of the Products, shall not become entitled to any proprietary rights in any such Products or documentation relating to the products. Furthermore, all proprietary rights (including but not limited to derivative copyrights) in any translation of any materials of documentation provided by Company or any modification thereto, shall vest exclusively in Company. Distributor shall take all reasonable measures to ensure that all proprietary rights of Company in the Product and the related documentation remain with Company and/or its Licensors. Company may affix its trade name, service marks or trademarks, now owned or hereafter acquired by Company (collectively the "Proprietary Marks"), to any of the Products. Distributor shall not have or acquire any right, title or interest in the Proprietary Marks, either used alone or in conjunction with other words or names, or in the good will thereof, and shall not use any such Proprietary Marks without the express written consent of Company. Upon termination of this Agreement, Distributor shall immediately return to Company all advertising sales or promotional material containing Company's Proprietary Marks and shall refrain from use of the Proprietary Marks. Distributor is hereby granted a limited license to use Company's trademarks solely for the purposes of promoting the Products under the terms of this Agreement. Distributor agrees not to apply for registration of any trademarks used by Company. Distributor shall not use or authorize the use of such trademarks, or sell under the Company trademark without the express written consent of Coimpany. Distributor shall not affix to any units of the Product purchased hereunder any trademarks or other marks, unless specifically agreed to in writing by Company on a case-by-case basis

b.    The Distributor will be expected to follow the requirements of applicable laws and regulations. In particular, Distributor shall notify Company (i) if it receives any complaint relating in any way to the function of any Company product (ii) if it becomes aware of any incident involving the function of any Company product that might require filing of a report under the USA Food and Drug Administration (FDA) Medical Device Reporting (MDR) requirements of Title 21 code of Federal Regulations Part 803 or the European Economic Area (EEA) Final Draft of Guidelines MEDDEV 2.12-1, Revision 4, April 2001. Upon the occurrence of such an incident, Distributor agrees to act in accordance with Company's instructions.

c.    Neither this Agreement nor any rights of Distributor hereunder shall be assignable or transferable by Distributor, in whole or in part, directly or indirectly, by operation of law or otherwise, without the prior written consent of the Company. Any change in control of Distributor shall be deemed to be an assignment herein. For purposes of this paragraph, a "change of control" shall mean any transfer of this Agreement by merger, consolidation or liquidation, or any change in the ownership of, with the exception being to key management or employees, or power to vote, the majority of the outstanding shares of or interest in Distributor, or the sale or other disposition of a majority of the assets of Distributor. Distributor represents and warrants that its current ownership and management are as set forth in Exhibit G.

d.    This Agreement shall be governed by the laws of the State of New York and any action brought to enforce this Agreement shall be brought exclusively in the State of New York.

e.    The headings or titles in this Agreement are for reference only and shall not in any way affect the interpretation or construction hereof. The failure by the Company at any time to enforce any of the terms, provision or conditions of this Agreement shall not constitute or be construed as a waiver by the Company of its prerogative to exercise such right at a later date. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes and cancels all prior agreements, claims, representations and understandings of the parties in connection with such subject matter. Except as otherwise expressly provided above, this Agreement shall not be modified or amended except by written agreement signed by duly authorized representatives of each of the Distributor and the Company.

f.    Company and Distributor agree during the term of this agreement, and for a period of twelve (12) months after termination, neither corporation will see to recruit each other's personnel, unless mutually agreed upon.

g.    With prior written approval from Company, Distributor may feature Company products on its web-site and print media, as long as product(s) featured are restricted to within the APR geography. In addition, Distributor understands that: (i) it is Company's policy to transact business only with those distributors who choose, unilaterally, to feature Company products on print and other media at prices not lower than Company's current list price (the "Pricing Policy"); and (ii) if Distributor features Company products on print or other media, unilaterally, at prices lower than Company's current list price, then Company may terminate this contract pursuant to Section 15.a hereof upon giving Distributor 10 business days notice.

IN WITNESS WHEREOF, the parties have executed this non-exclusive Agreement as of the day and year first above written.

| **ORIDION CAPNOGRAPHY INC.** | **CVC, INC.** |
|---|---|
| By: _Tom Milberg_ | By: _[signature]_ |
| Name: _[signature]_ | Name: _Richard S. Manley Jr._ |
| Title: _VP of Sales_ | Title: _President_ |
| Date: _4/15/05_ | Date: _3/31/05_ |
| By: _____ | |
| Name: _____ | |
| Title: _____ | |
| Date: _____ | |

**EXHIBIT A - <u>Products and Suggested List Pricing and Distributor Discount</u>**

### Dealer Pricing Program

| CATALOG # | DESCRIPTION | 25/Case Suggested Price | Dealer Pricing |
|---|---|---|---|
| OO7267 | Smart Capnoline O2 Adult | $287.50 | $215.63 |
| OO7268 | Smart Capnoline O2 Intermediate | $287.50 | $215.63 |
| OO7269 | Smart Capnoline O2 Pediatric | $287.50 | $215.63 |
| OO6912 | O2CO2 Nasal Filterline Adult | $250.00 | $187.50 |

| | | | Suggested Price | Dealer Discount |
|---|---|---|---|---|
| OO6913 | O2CO2 Nasal Filterline Pediatric | | $250.00 | $187.50 |
| OO8180 | Capnoline H O2 Adult | | $350.00 | $262.50 |
| OO8181 | Capnoline H O2 Pediatric | | $350.00 | $262.50 |
| OO7741 | Smart Capnoline O2 Adult Long | | $300.00 | $225.00 |
| OO7742 | Smart Capnoline O2 Intermediate Long | | $300.00 | $225.00 |
| OO7743 | Smart Capnoline O2 Pediatric Long | | $300.00 | $225.00 |
| OO7739 | O2CO2 Nasal Filterline Adult Long | | $262.50 | $196.88 |
| OO7740 | O2CO2 Nasal Filterline Pediatric Long | | $262.50 | $196.88 |
| OO7264 | Smart Capnoline Adult | | $250.00 | $187.50 |
| OO7265 | Smart Capnoline Intermediate | | $250.00 | $187.50 |
| OO7266 | Smart Capnoline Pediatric | | $250.00 | $187.50 |
| OO8177 | Capnoline H Adult | | $312.50 | $234.38 |
| OO8178 | Capnoline H Pediatric | | $312.50 | $234.38 |
| OO8179 | Capnoline H Infant/Neonate | | $312.50 | $234.38 |
| OO9818 | Smart Capnoline Plus | New | $275.00 | $192.50 |
| OO9822 | Smart Capnoline Plus O2 | New | $312.50 | $218.75 |
| OO9826 | Smart Capnoline Plus O2 Long | New | $325.00 | $227.50 |
| OO8174 | NIV Line Adult | | $250.00 | $187.50 |
| OO8175 | NIV Line Pediatric | | $250.00 | $187.50 |
| XS-04624 | Filterline H Set Adult/Pediatric | | $325.00 | $243.75 |
| OO6324 | Filterline H Set Infant/Neonate | | $325.00 | $243.75 |
| XS-04620 | Filterline Set Adult/Pediatric | | $200.00 | $150.00 |
| OO7768 | Filterline Set Adult/Pediatric Long | | $212.50 | $159.38 |
| OO7737 | Filterline H Set Adult/Pediatric Long | | $337.50 | $253.13 |
| OO7738 | Filterline H Set Infant/Neonate Long | | $337.50 | $253.13 |
| OO7738 | Filterline H Set Infant/Neonate Long | | $337.50 | $253.13 |

| Part Number | Monitors | Suggested Price | Dealer Discount |
|---|---|---|---|
| CS04178 | Microcap  Capnography | 2,900.00 | 1,700.00 |
| CS06506 | Microcap Plus Capnograph/Pulse Oximeter | 3,900.00 | 2,167.00 |
| CS07977 | VitalCap Basic Monitor (HP Compatible) | 3,300.00 | 2,013.00 |
| CS07970 | Vuelink Interface Kit | 500.00 | 305.00 |

| | Accessories | Suggested Price | Dealer Discount |
|---|---|---|---|
| CS04321 | Carrying Case | $75.00 | $56.25 |
| CS07779 | Protective Boot | $75.00 | $56.25 |
| CS03743 | Clamp | $115.00 | $86.25 |
| CS03736 | Battery Pack | $100.00 | $75.00 |
| CS03755 | Batter Charger | $250.00 | $187.50 |
| CS03732 | Batter Pouch | $30.00 | $22.50 |

| CS04934 | Medical Grade AC Adapter | $100.00 | $75.00 |
| CS07143 | D to A Converter (Sleep Labs) | $625.00 | $468.75 |
| CS04284 | Communication Adapter Kit | $110.00 | $82.50 |
| SC08505 | 12V Cable for MicroCap Plus | $35.00 | $26.25 |

## Additional 5% Discount for Large Volume Accounts

Accounts buying more than 3,000 annual filterlines will qualify for an additional 5% discount off dealer pricing once the following criteria are met.

1) There is a 6 month history of ordering or a standing purchase order from a hospital with 10 or more cases per month (minimum of 3,000 annual) of filterlines.
2) This additional 5% rebate will be documented in monthly tracing reports supplied by Distributor.
3) This rebate of 5% will be paid within 45-days of the end of a quarter, in the form of a credit, after meeting criteria outlined in #2.
4) Company reserves the right to adjust rebate pricing at such time that Company develops new packaging that allows the reduction of the listed unit price of Filterlines® by 7%.

**EXHIBIT A1 – <u>Exclusive Products</u>**

| CATALOG # | DESCRIPTION | | 25/Case Suggested Price | Dealer Pricing |
|---|---|---|---|---|
| | **OR Products** | | | |
| OO7409 | Smart MAC Plus O2 | New | $150.00 | $105.00 |
| OO7604 | Smart MAC 02 Adult | | $125.00 | $93.75 |
| OO7605 | Smart MAC 02 Pediatric | | $150.00 | $112.50 |
| OO7609 | O2/CO Nasal MAC Adult | | $93.75 | $70.31 |
| OO7610 | O2/CO Nasal MAC Pediatric | | $93.75 | $70.31 |
| OO9818 | Smart Bite BlocO2 7ft (25/case) | New | $387.50 | $271.25 |
| OO9822 | Smart Bite BlocO2 14ft (25/case) | New | $400.00 | $280.00 |
| To be determined | 02/C02 Nasal Cannula Pak | New | $250.00 | $187.50 |
| To be determined | Smart Plus 02 Pak | New | $312.50 | $234.38 |
| To be determined | Filterline Pak | New | $200.00 | $150.00 |

\* **All O2 products have O2 connections not tubing**

**EXHIBIT B – <u>Area of Primary Responsibility</u>**

The Territory shall be the following US states:

TX, OK, CO, NM, AZ, UT, NV, NE, KS,WY, Western AR

The markets shall be:

**Hospitals, Outpatient Surgery Centers, Ambulatory Surgery Centers**

**EXHIBIT C – Quota Requirements**

**Filterline Quota**

Year 1:

Consumables - $520,158
Monitors - $108,800

**Filterline Quota**

| CVC Market Sizing | Quota | | Run Rate |
|---|---|---|---|
| 25% | Q 1 | $904,623 | $226,156 |
| 38% | Q 2 | $56,539 | $343,767 |
| 67% | Q 3 | $85,939 | $606,098 |
| | Q 4 | $151,524 | $904,623 |
| | Total | $226,156 | |
| | | $520,158 | |

**Monitor Quota**

| Reps | Quota | Annual Units | Total | Dollars |
|---|---|---|---|---|
| 6 | | 8 | 48 | |
| 5 | Q 1 | 11.00% | | $8,976 |
| 7 | Q 2 | 15.00% | | $12,240 |
| 14 | Q 3 | 30.00% | | $24,480 |
| 21 | Q 4 | 44.00% | | $35,904 |
| 48 | Total | | | $81,600 |

**EXHIBIT D -- <u>Terms of Sale</u>**

- Terms are net 45 days for payment.

- Payable in U.S. dollars by electronic checking deposit to

Fleet Bank/Bank of America
235 Needham Street
Newton, MA 02464
(617) 630-1813
(800) 841-4000

ABA (Routing)# 011000138
Account #      9420131550

- A compound 1.5% interest penalty per month may be charged Distributor on all debt exceeding 45 days.

- Lead times on order will be no longer than the following

  - Consumables 6 weeks

  - Monitors 60 days

**EXHIBIT E – <u>Returned Goods Policy</u>**

All returns require prior written approval through the Company's Material Return Authorization Procedure.

Items returned to the Company without such approval shall be returned to Distributor at Distributor's expense. Such returns, may be subject to a 15% restocking charge

- The following Products may <u>not</u> be returned to the Company for credit.

    - Products which have been used in connection with the diagnosis or care of patients

    - Obsolete Products see 9.i

**EXHIBIT F – <u>Product Warranty</u>**

Warranties and Distributor's remedies hereunder are solely for the benefit of Distributor and shall not be extended to any person whatsoever. Distributor shall be responsible to its customers for any and all warranties which it makes relating to products it has purchased from Oridion and for ensuring that replacements and other repairs required in connection with the said warranties are satisfactory.

Oridion warrants to Distributor that each monitor to be delivered hereunder will be free of defects in material and workmanship under normal use and service for a period of twelve (12) months from the date of Distributor's invoice to the end-user for the Monitor.

If, during the warranty period, any component part of the Monitor becomes defective by reason of material or workmanship, and provided the Distributor immediately notifies Oridion of such defect, Oridion shall, at its option, supply a replacement part, or request the return of equipment to its plant for repair. Distributor shall pay shipping and handling costs of the return to Oridion's premises. Return of the repaired or replacement Monitor to the end-user's original destination shall be at the expense of Oridion unless Oridion determines that the Monitor is not defective within the terms of the warranty, in which event Distributor shall pay Oridion all costs of handling, transportation and labor at Oridion's then prevailing rates. Risk of loss or damage to returned Monitors shall be borne by·the Distributor until delivery to the Oridion's facilities; risk of loss of or damage to repaired or replacement Monitors shall be borne by the Oridion until delivery to·the Distributor's facilities.

All parts that have been replaced shall be the property of the Oridion. Oridion shall be released from all obligations under its warranty and this warranty shall not apply to any Monitor or component parts, that (a) have been damaged by improper operation, maintenance, misuse, accident, or neglect; (b) have been used in a manner not in accordance with the instructions supplied by Oridion; (c) have had changes or repairs made without written authorization of Oridion to do so. Repaired or replaced parts shall be covered by this warranty for a period of the greater of the remainder of the warranty period hereunder or ninety (90) days from the date of delivery.

Oridion makes no warranty with regards to Consumables but guarantees that shipped Consumables shall be free of defects in both material and labor. Any Consumables which are found defective in workmanship and/or material to Buyer upon the receipt thereof, will be replaced at no cost by Oridion subject to the above provisions regarding determination of products not defective by Oridion.

THE ABOVE WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ABOVE WARRANTIES CONSTITUTE ORIDION'S SOLE AND EXCLUSIVE LIABILITY FOR DEFECTIVE OR NONCONFORMING PRODUCTS. ORIDION SHALL NOT BE LIABLE TO ANY PERSON FOR ANY SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, DAMAGES TO OR LOSS OF PROPERTY OR EQUIPMENT, LOSS OF PROFIT, LOSS OF USE OR DATA, LOSS OF REVENUES OR DAMAGES TO BUSINESS OR REPUTATION ARISING FROM THE PERFORMANCE OR NON-PERFORMANCE OF ANY ASPECT OF THIS AGREEMENT OR ANY PURCHASE ORDER HEREUNDER, OR FROM ANY CAUSE WHATSOEVER ARISING FROM OR IN ANY WAY CONNECTED WITH THE MANUFACTURE, SALE, HANDLING, REPAIR, MAINTENANCE OR USE OF THE PRODUCTS, WHETHER OR NOT ORIDION SHALL HAVE BEEN MADE AWARE OF THE POSSIBILITY OF SUCH LOSS. IN NO EVENT SHALL ORIDION'S LIABILITY FOR PARTICULAR UNITS OF THE PRODUCTS HEREUNDER EXCEED THE PURCHASE PRICE OF SUCH UNITS.

**EXHIBIT G – Ownership and Management of Distributor**

THIS DISTRIBUTOR Non-EXCLUSIVE AGREEMENT has been entered into by the Company in reliance on the representations that:

The following persons or entities are major owners of shares of, or units in Distributor:

| Name | Address | % of Ownership |
|---|---|---|
| Richard Manley | 2320 Michigan Court, Arlington, TX 76016 | 85.0% |
| Bruce Cheatham | " | 7.5% |
| Jack Burgess | " | 7.5% |

**EXHIBIT H – Distributor's business relationships**

| | |
|---|---|
| Vapotherm | High-flow oxygen therapy |
| VidaCare | Rapid vascular access |
| Colin | NIBP monitors |
| Mercury | Anesthesia disposables (no capnography) |
| Lifetech | Regional block needles; nerve stimulators |
| Maxtec | Oxygen analyzers |
| Silverlon | Wound/burn dressings |
| Masimo | Oximeters |
| Airon | Transport ventilators |

(To be supplied by Distributor on Distributor's letterhead).

 A full disclosure of all products represented by Dealer as well as current status of sales relationship with competitors is required.

**EXHIBIT I – Certificate of Insurance**

To be supplied by CVC ownership.

## END OF AGREEMENT

*************************************************************************

**EXHIBIT 2**



October 3, 2006

**Oridion**

Richard Manley
President
CVC, Inc.
2320 Michigan Court
Arlington, TX 76016

Dear Richard,

We hereby notify you in writing that due to CVC Inc.'s (**"CVC"**) contractual involvement with Sentec Corporation, in direct violation of Article 14 (Distribution of Competitive Products Policy) of the Distribution Agreement entered into by and between Oridion Capnography Inc. (**"Oridion"**) and CVC (the **"Agreement"**), we wish to cease working with CVC and accordingly we give you notice of termination of the Agreement.

As per Article 15.1(a) of the Agreement the termination shall become effective 10 days from the date hereof.

Upon termination CVC shall be obligated to pay Oridion the balance of any and all payments due to Oridion for the Products up to and including the date of termination.

Oridion shall honor those agreements between CVC and end-user of Oridion product, to the anniversary of Agreement, at established dealer pricing.

Please note that according to the Agreement, Article 13 (Confidential and Other Information) shall survive the termination of the Agreement.

Sincerely,

Thomas Millonig
Vice President, Global Sales

cc: Bruce Cheatham